Good morning, Your Honors, and may it please the Court, Brian Layton, Clovis, California, on behalf of the plaintiffs and appellants in this matter. We believe that virtually everything is covered in our brief, so I certainly welcome your questions, but I think that it's important to understand that the Raisin Marketing Order Act issue, out of the 50 or so that the federal government oversees, this is the only one where producers' product, that they spend all of the money in cultural costs in producing without any knowledge of what may happen to it, where title is actually taken by the federal government for the federal government's own use. The Raisin Administrative Committee is nothing but an arm of the Secretary, and it takes the producer's product, takes title to it, sells it at a profit, the packers do and the handlers do, USDA purchases a sizable amount of those, quote, which may be a great idea, the furnishings for those programs, but the only one that loses on it are the producers that produced it to begin with. The packers will make a bid on reserved raisins to purchase it from the Raisin Administrative Committee, which is from USDA, at very dirt cheap prices. They will bid on it to USDA, USDA awards it based upon the lowest bid, and USDA then purchases, in fact, in the two fiscal years at operation here, 2002 and 2003-2004, the USDA purchased 34.5 million pounds in 2002 and 35.1 million pounds in 2003, and it all belongs to the producers. Counsel, if I could ask you a question. Judge Gould, did you mean to say that USDA awards it based on the lowest bid or the highest bid? Because I think you said lowest. USDA wants to purchase it from the packers at the lowest price that they can. But you then said that they then put it up for bid and that the raisin growers want to buy it, but they sell it to the lowest bid. Okay, let me restate that. The packers, who have not one penny invested in these reserved raisins, they purchase it from the Raisin Administrative Committee, which is USDA, at a certain set price, a price determined by the RAC with the Secretary's approval. They then put it out, USDA puts it out for bid as to how much raisins they want, when they want them, when they want the deliveries, what size containers, etc., and where the shipments are going to be. The packers then make a bid to USDA, and USDA will then award it to the lowest bidder, which means USDA pays less money for it. All the packers can bid on it, but then the packers also have the ability to use the same reserved raisins that they didn't produce and have not one penny invested in. They buy it from the Raisin Administrative Committee, USDA, at a certain price set by USDA and the packers, and then they sell it into the export market, and they're free to do that. The whole purpose of 6086E of the Agricultural Marketing Agreement Act in 1937, it says that the entire benefit of these reserves, etc., is to benefit the producers, and that the reserves are supposed to be equitably distributed to the producer who produced the raisins. The purpose, as I understand it, of the reserve requirement is to modulate, I'll use that word, to control supply and demand, so the price for the open market portion is maintained, is that right? Well, yes, theoretically, that's what it was supposed to be for. I mean, that's the idea behind Monthly, and whether it's accurate or not, but that's the idea behind it. That's the idea behind it, and you can see it in other marketing orders. I mean, Orange Marketing Orders had you could only pick so many per week, etc., to maximize the price, but the whole purpose of the thing is to maximize the return to the producers through making sure that the supply and the demand is consistent on a regular purpose, and you hold back raisins, but here, as soon as the raisins are delivered to a handler, they become the property of USDA, the reserve portion does, and then the packers who have nothing to... Your contention is that the process that you've described to us is, in fact, a taking. A physical taking of property without just compensation.  When you gave your supplemental explanation, you again said that after they put it out to bid, that they sell it to the lowest bidder. Is that really what you mean to say? USDA purchases it at the cheapest price they can from the packers. If the packers offer it for sale at $0.32 a pound, one does. One is at $0.31 a pound. One is at $0.30 a pound for delivery dates. USDA will pick the $0.30 a pound and award the contract to the packer who bid the contract to USDA at the lowest price. The USDA will buy at the lowest price that's offered, right? Correct. Okay, but I thought other people, when they put it out for bid, I thought the way you were explaining it was that other people other than USDA could bid. No, USDA bids on the product they want for their nutritional programs. The packers can also purchase reserve raisins from the Raisin Administrative Committee. Perhaps I confused you. The Raisin Administrative Committee is the arm of the Secretary. The packers will purchase reserve raisins from the RAC, Raisin Administrative Committee, and they will then sell them in the export market at whatever price they can get for them. Of course, they're not going to buy them from the RAC unless they can make a profit on them. Thank you, counsel. The whole purpose of this is that the sale of the reserve was supposed to be equitably distributed to the producers who produced the raisins. As I pointed out in our brief, the producers have not received one dime for any reserve raisin since 1994, and there's been a reserve every year. The two years in question, 2002, there's a 47% reserve, final reserve, which means they could only sell on the open market 53% of the raisins, and the next year it was 30%. At the point this case is in front of us, the question on what you're focusing on right now, that is whether this process involves a taking without just compensation. Correct. The issue before us is whether that claim is allowable or not. The proof, et cetera, if the claim is allowed, will occur in subsequent proceedings, right? No, because the court can decide it because the factual setting of this... No, no, no, no. I'm not being clear. Okay. The district court said you didn't have a claim. The district court said it's a regulatory taking, not a physical taking, and therefore, because it's a regular taking, you are basically paying a toll to sell your regular free tonnage raisins. Understood. Okay. If we disagree with that and send it back, there will be some kind of proceeding, a trial or otherwise, to determine the amount of the taking, what the just compensation should be, that sort of thing. Yes. The issue before us is whether your client should be allowed to pursue that claim. Correct. That's a physical taking. But the second aspect of this case is my clients, out of the amount, they were imposed penalties of $695,000, $661,000 of which regards the reserve. And USDA, for the penalty, a USDA judge, which was affirmed by the district court, set the penalty based upon the price of the free tonnage raisins, not the zero price that the producers receive for reserve raisins. They also imposed, on top of that, a $300 a day fine for not holding the reserve for the account of the board for over 500 days, which amounted to another $177,000 of penalties on top of the reserve tonnage that they said was the, what the field, the general field price the producers got paid for their free tonnage raisins. But one of the mistakes, a clear error in my opinion, that the administrative law judge made and then the judicial officer made, compounded by the district court, is that they found that the appellants were handlers who acquired raisins and therefore the reserve obligation fell on them and therefore they were penalized for not keeping it. Is it possible to be both a producer and a handler? It is possible to be a producer and a handler if the producer is the one that actually packs, stems, sorts, puts it in the stream of interstate commerce, but that's not who they sued. They didn't sue the 60 some odd producers that delivered raisins to a facility where the packer, where the producers actually packed their own raisins. The equipment was leased to them, they packed their own raisins, they sold it. When they received the purchase price, they then paid the lease or for the use of the facility to pack their own raisins. There was no plaintiff that actually acquired any raisins and the reserve obligations and the penalties imposed is for handlers who acquire raisins. Under the Uniform Commercial Code, acquisition means title passes and that there is consideration paid. No one who is an appellant here received consideration or paid consideration to the producers for their raisins. The producers owned it all the way through. It was sold to the ultimate buyer somewhere. USDA went on the theory that the plaintiffs here put it in the stream of interstate commerce and that our long time, unstated, undocumented, anywhere interpretation means if they received it, if it came to them somehow, but the marketing order itself says for raisins that are acquired and acquisition and acquiring under the Uniform Commercial Code means you actually get title to it. We don't believe that the government ever proved by any substantial evidence whatsoever that even if they could consider one or more of the appellants handlers, they never showed that what they did was acquired raisins from anywhere. When it goes to a normal packer, the packer takes it all. They receive it. They hold it. They sell it. They put the reserve aside for the account of the board. They deliver it to the board if the board wants it. They deliver it to somebody else if the board wants that reserve transferred to somebody else. Here, no one, and if you have a general overall theme, they found each one of these appellants personally and liable for the entire amount of these penalties that were imposed without isolating any evidence as to any one particular individual. I mean, the Durbons, they own Lassen Vigards, which owns a packing facility. They lease it out to the producers that go in there and pack their own. How did they ever acquire raisins? They didn't acquire them. I think you have one minute left if you want to save it for rebuttal. Yes, I'd like to save it for rebuttal. And just one other thing, in the Walnut case, which the government cites, which is the Ninth Circuit case Wallace v. Hudson-Douglas, they said that that case is on all fours. It was regarding the federal Walnut marketing order. But there the court says, this court says, the order contains no absolute requirement of delivery of walnuts to the control board. The requirement is a conditional one. If the company chooses not to comply with the interstate requirements of the order, it may nevertheless retain all of its walnuts intrastate and dispose of them to interstate buyers. Here, 47% of your raisins now belong to USDA. You have no choice under their situation, so you can't penalize them for their self-help in not coughing up their raisins that you're not going to pay them for. Anyway, I'll reserve whatever time I have left. Six seconds. Good morning. May it please the Court, Benjamin Hall on behalf of the United States Department of Agriculture. I suspect the panel might be interested in the point that was made for the first time in the appellant's reply brief, and was repeated here this morning, that not one dime was paid to producers from the reserve pool since and including 1994. The court will note there is absolutely no citation to any evidence in the record to support that statement. And in fact, it is incorrect on an order of hundreds of millions of dollars. Just in the period between 1997 and 2007. Is this in the record? It is not. It is not, Your Honor. What you're about to cite is not in the record? Correct, Your Honor. What's the source? The source is the Raisin Administrative Committee. And the point is, it's a dramatic loss. These are records of the Raisin Administrative Committee that were never admitted in the proceedings below? The proceeding below, correct, Your Honor. The proceeding below was. I mean, I have some sympathy for the notion that this was raised for the first time in the reply brief. And there's not a surreply in the briefing rules. But you're about to talk about something that's not part of the record. I'll be glad not to in the hope that the court would also not then take into consideration the assertion without any evidence in the reply that producers have been paid nothing. Because that certainly goes to the takings argument and gives at least some empathy toward that argument. Well, first of all, we're not fond of listening to arguments raised for the first time in the reply brief for this very type of reason. But if there's an assertion made there that's not supported by the record, you can be sure we won't pay any attention to it. Thank you, Your Honor. So why don't you go on. Further with respect to the takings issue, which has come to dominate this case at this stage, but certainly was not the real issue that was litigated at the administrative stage and that was considered by the district court. But the argument being. Well, administrators aren't real hip on listening to Fifth Amendment takings claims under modern jurisprudence, are they? Certainly true, Your Honor. But let me make this point, if I may. The suggestion that this constitutes a physical taking by the government is incorrect on a couple of levels. For one thing, there is no physical taking. The process is that every year the Raisin Administrative Committee, based on its projections of the Raisin supply and predicted demand, sets a reserve requirement. In the two crop years we're talking about in this case, the reserve requirement was exceptionally high because the anticipated supply far outstripped the demand in those years. But what happens is when that reserve is recommended by the RAC and then enacted ultimately by the secretary, the handler who has possession of those raisins is instructed to segregate those and hold them for the account of the RAC. Well, first of all, let's address your notion that there has to be a physical taking. Government all the time does things that don't involve the physical taking of property. I applied to move the wall in front of my house closer to the roadway to deal with noise, and the city says you can't do that. There's a set aside built into the process. They haven't taken my property physically. They haven't run the road over it. They just told me that you can't use your own property. So there's conceivably a takings claim there. It doesn't involve any physical taking at all. Let me see if I can understand the sort of ambit of the takings issue. Let's suppose hypothetically I am the manufacturer of widgets, and I am subject to the widget administrative committee under some federal agency. And under the umbrella of the widget control authority, although I produce 100 widgets in 2010, to control the market for widgets, they tell me that I can only sell five on the open market. Follow me so far? I do. And that I have to reserve five widgets so that supply and demand doesn't get out of whack. And then after I've reserved that, they tell me you just keep them there in your warehouse. Don't send them anywhere else. You just keep them there in your warehouse. I'm not free to put them out on the open market. Then they come back and say, okay, here's what we like to do with the reserved widgets. We like to buy them at a real low price, and then we like to either hand them out to social service agencies or sell them in France and Italy. Is my analogy working so far? I understand it. Okay. All right. Tell me why that's not a taking. Well, it's not a taking because you don't have a legitimate investment-backed expectation to be able to market. I paid to produce the widgets. Well, if you do so with knowledge of the fact that the industry- I don't know from year to year. I try to make the best estimate I can. It's a little like the withholding for income tax purposes. You hope after April 15th you don't get too much back from the government because that means they've had that money for a while. But in this year, in 2010, I produced 100, and they told me to reserve 50, half of them. That's fine for supply and demand. Then they want to go out and buy these at a real low price, well under the market price, and either give them out to school lunch programs or whatever or sell them in France and Italy. You're telling me that's not a taking. Well, it's-excuse me for saying so, Your Honor, but it's an incomplete hypothetical. Okay, tell me how. Because in the raisin industry, the appellants have referred to the RAC as an arm of the federal government. It's certainly an instrumentality of the federal government. However, its members are industry people, about 75% of whom are appointed to represent producers. And the very reason for the reserve, and I think Your Honor has- That's so the committee has expertise as to the market, right? Well, not only expertise, but also to ensure that the benefit of the producers is protected in the decisions that are made. In the court's widget analogy, I didn't understand whether there was- you mentioned a governing body without specifying who serves on that governing body and whether their interests are aligned with the interests of widget makers generally. Assume a complete analogy. It's got other widget makers on it, et cetera. If you go into the raisin business, where there is a federal marketing order that's been in place since 1949, and as Mr. Horn did, when he started growing California raisins in 1969, 20 years later, throughout his entire career as a raisin producer, California raisins have been governed by this order and this volume regulation. You can't enter into that business with no legitimate expectation that there won't possibly be a reserve requirement set because the system is designed, as the courts observe, to regulate volume in order to try to balance supply and demand and to achieve the highest possible domestic prices for all growers generally. So there is a return both with respect to the higher prices that all producers realize by virtue of the volume regulation. And that's why you argue it's a regulatory taking and not a Fifth Amendment taking without just compensation. If it's a taking at all, Your Honor. It's a regulatory taking. If it is, it's regulatory. Now, one other question I have. The first part of the government theory is that the ones who benefit from this are the producers because they receive a higher price for the raisins that they retain, and therefore they are the beneficiaries of this order. Secondly, whatever the government buys at this lower price, there is some procedure where the producers receive back any profit? That's correct, Your Honor. There is what's called a reserve pool. And when reserve raisins are disposed of by the RAC, and because raisins are a storable product, commodity, they are dehydrated, they last a while. It's sometimes years later when those particular crop years raisins might be disposed of by the RAC. But the RAC maintains a reserve pool into which the proceeds of all the dispositions of reserve raisins are deposited. And then those monies are paid back to the producers on a pro rata basis based on their contribution to that year's volume. After you deduct the costs?  And no one else receives these proceeds other than the Raisin Council to reimburse it for its costs, and then everything else goes back to the producers? That's correct, Your Honor. That's the way the system is set up. So in your view, the sole beneficiary of this taking, if it's a taking, are the producers? Well, I understand Appellant's argument that, for instance... I think you want to say yes. Yes. Well, I'm trying to be fair. Certainly one of the ways that the RAC disposes of reserve raisins is sometimes to sell them in non-competitive markets. Certainly the government and donees and other folks benefit from this system and program in the sense that they are able to acquire raisins at less than perhaps the full domestic price. Let me ask you a factual question, and if it's not in the record, tell me so at the start. Were there years in which producers slash handlers did not have to give up any raisins? I know that the answer is yes. I don't know for sure whether it's in the record, Your Honor. Counselor, I've got a question. I have a question, if you could clarify. Yes, Your Honor. Just on this legal framework, because of something you argued about this going back to the 40s. Maybe I was wrong, but I thought this legal framework was set up post-recession and actually started in the 1930s. Can you tell me the history of this particular program in terms of the legal framework? The general framework, Your Honor, for agricultural marketing orders generally, and there are many of them for different commodities, but the general framework did arise out of the Great Depression. The specific marketing orders were promulgated at different times, and the raisin marketing order, I believe, came into effect in 1949 when it was approved by two-thirds of the raisin producers. I should also mention that producers have the power to get rid of the system. There are provisions in the law that provide that the secretary shall terminate the raisin marketing order if the producers decide they don't want it. It's not beneficial to them anymore. There is a mechanism. I'm running out of time, but let me make one more point quickly. The real heart of this case at the administrative level and at the district court was, what is the meaning of the term acquire? and did the horns in their businesses, they set it up, acquire raisins within the meaning of the marketing order. There is no reference in the marketing order or in the statute to acquisition of title within the meaning of the UCC. It doesn't exist. There's a specific definition of acquire, and it means to have or obtain possession of raisins by a handler at a packing facility. That is the place at which the raisins are stemmed, seeded, cleaned, sorted, and packed into market. The horns, through these two crop years we're discussing, packed and sold into the market approximately 3 million pounds of raisins for which no one acted as the handler. No one set aside reserves. No one paid any assessments to the RNC. Can I just ask you one more question back to the Constitution? Would it be your position that the government or the raisin growers, the council, could set a limit on the amount of raisins that a producer could grow each year? I don't believe that to be the case, Your Honor. No, no, it's not the case. I said could the government under the regulatory authority, instead of saying here's what happens to the excess raisins, could it say here are the amount of raisins that may be produced in a year, and however the formula would go to each? Would that be constitutional to limit the amount of agricultural goods that can be grown? Without paying. Right. In other words, as opposed to setting a reserve to limit... Like my cousins who farm cotton in Arizona. They get paychecks from the government for not growing a certain amount of cotton. Right, right. It's a different case, Your Honor, and I honestly haven't studied it, but I certainly believe it would be constitutional in the framework of the agricultural marketing system and the design to protect, regulate volume for the benefit of all the producers. I have one more question. I have one more question if you don't mind. You talked about that the producers or the participants in this process have the mechanism of doing away with the whole process conceivably. My question is this, is there any other mechanism that an agreed producer could use to challenge the equity distribution in a given crop year's net reserve sale proceeds? Other than doing away with the whole system. In other words, to challenge the decision of the RAC with respect to the disposition of the proceeds? Yeah. As far as a specific procedure, I'm not sure. There certainly is a political procedure in the sense of... A legal procedure. A legal procedure. Not that I'm aware of. Okay. Thank you very much. All right.  Thank you very much, Your Honor. A couple things. If the court refers to Evans, which is cited in our reply brief, and cited in the government's brief, which was a challenge in the court of claims by producers regarding the reserve, the court did note in that opinion that the reserve was worthless in most years or very near so. Secondly, it was raised before Judge O'Neill in the court below, and that it was worthless, the reserve. Secondly, counsel said that because of the marketing order, we had no reasonable investment-backed expectation. That only applies in regulatory takings. Only applies in regulatory takings. The case of Palazzolo, I'm butchering the name, which is cited in my reply brief, the U.S. Supreme Court case in 2003, Palazzolo v. Rhode Island, talked about the fact that for the government to claim on a physical taking that they had no reasonable investment-backed expectation doesn't apply to physical takings, and it would otherwise allow the state to put an expiration date on the takings clause. All you have to do is start a marketing order and say from here on out, we can take your property whenever we want. Let me ask the question I asked your opponent. Were there years in which there were no reserves that had to be given up? There was one year somewhere in the 90s when they had a huge rain. This year was a real short year, but they put in a 10% reserve because who knows? The answer to the question is yes, and apparently it's historical. Is that right? Yes, historical, and nothing recently where it's been even close to less than 20% reserve. Okay. Thank you, counsel. Thank you, counsel. The time has expired. Thank you very much, Your Honor. Thank you. Thank you both very much. The case, as just argued, will be submitted. Yeah, I think I heard Judge Hawkins making an inquiry about a break. Yes. For me, it's okay to do it either now or after. All right. Well, let's do it. Next case for oral argument is Eaton v. Siemens.
judges: Reinhardt, Hawkins, Gould